IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE ESTATE OF BRIAN EDWARD FISHER, deceased, by and through the ADMINISTRATRIX OF THE ESTATE JAMIE FISHER, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF PITTSBURGH; PITTSBURGH BUREAU OF POLICE; ROBINSON TOWNSHIP; ROBINSON TOWNSHIP POLICE DEPARTMENT; POLICE OFFICER JORDAN PRICE; and POLICE OFFICER JOSEPH TOMKO, <br><br> Defendants. | Civil Action No. 2:24-cv-1234 <br><br> Judge J. Nicholas Ranjan <br> Magistrate Judge Patricia L. Dodge |

## REPORT & RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that Defendants' motions to dismiss (ECF Nos. 47, 49) be granted in part and denied in part.

### II.  REPORT

#### A.  Relevant Procedural History

Plaintiff Jamie Fisher ("Plaintiff") commenced this action following the death of her brother, Brian Edward Fisher. The initial Complaint named the City of Pittsburgh, Pittsburgh Bureau of Police (collectively "Pittsburgh Defendants"), Robinson Township, Robinson Township Police Department (collectively "Robinson Defendants"), Pittsburgh Police Officer Jordan Price ("Price"), and Robinson Township Police Officer Joseph Tomko ("Tomko"). (ECF No. 1.)

Motions to dismiss were filed by the Robinson Defendants and Tomko (ECF No. 36), as well as the Pittsburgh Defendants (ECF No. 29.) Price filed an Answer. (ECF No. 31.)

In response, Plaintiff amended the complaint on November 11, 2024. The Amended Complaint asserts claims for Fourth and Fourteenth Amendment violations against all Defendants (Count I); *Monell* liability–failure to train against the City of Pittsburgh (Count II); *Monell* liability–failure to train against Robinson Township (Count III)[1]; §1983 assault and battery against Price (Count IV)[2]; state-law right of survival against Price and Tomko (Count V); and state-law wrongful death against Price and Tomko (Count VI). (ECF No. 43.)

The Robinson Defendants and Tomko collectively moved to dismiss the Amended Complaint on November 25, 2024. (ECF Nos. 47.) That same day, the Pittsburgh Defendants filed a separate motion to dismiss (ECF Nos. 49), and Price filed an Answer (ECF No. 51). Both motions have now been fully briefed (ECF Nos. 48, 50, 56, 57, 61) and are ready for disposition.

### B. Facts Alleged in the Amended Complaint

The events giving rise to this action occurred on September 1, 2022. Robinson Township Police ("Robinson PD") received a call from a woman stating that she had not seen her adult daughter, Leah Hess ("Ms. Hess") in about twenty-four hours. (ECF No. 43 ¶ 14.) She did not say that Ms. Hess was in imminent danger and did not file a formal missing person report. (*Id.* ¶¶ 15-16.)

Robinson PD dispatched Officer Tomko to investigate and locate Ms. Hess. (*Id.* ¶ 16.) Tomko subsequently determined that Ms. Hess was at a house located on Rydal Street in

---

[1] The caption of Count III also names the City of Pittsburgh. It is clear from the body of the claim, however, that the allegations relate solely to Robinson Township. *See* ECF No. 43 ¶¶ 140-72.
[2] The Amended Complaint contains two claims captioned "Count III."

2

Pittsburgh's Crafton Heights neighborhood ("the Rydal house"). (*Id.* ¶ 17.) Ms. Hess was staying at the Rydal house with Brian Fisher ("Fisher") freely and of her own volition. She was not in any danger and had planned to stay with Fisher for "another week or two." (*Id.* ¶¶ 21-22.)

The Rydal house is located outside of Robinson PD's jurisdiction. As a result, Tomko contacted the Pittsburgh Bureau of Police ("PBP") to request assistance in conducting a wellness check on Ms. Hess. PBP dispatched Officer Price to assist Tomko. (*Id.* ¶¶ 23-24.)

The Rydal house is one-story and has a front yard that slopes down towards the street. The front door opens onto a small porch that has steps connecting down to a driveway below. (*Id.* ¶ 25.) By the time Tomko and Price arrived, it was dark outside, the front door was closed, and blinds on the front windows were closed. (*Id.* ¶ 28.) Price positioned himself in the front yard to the right of the porch while Tomko stood on the porch and aggressively knocked on the door without announcing that he was a police officer. (*Id.* ¶¶ 26-28.) Fisher opened the door and Price fired three shots from his firearm, hitting Fisher in the chest. (*Id.* ¶¶ 32, 41.) The shots were fired within three seconds of the door opening and before Fisher had fully presented himself through the doorway. (*Id.* ¶ 32.) Price later said that he saw a firearm in Fisher's right hand. (*Id.* ¶ 33.)

Tomko and Price immediately retreated to the end of the driveway and called for emergency medical services. (*Id.* ¶¶ 42-43.) Ms. Hess, who had been in the house at the time of the shooting, attempted to help Fisher but ultimately was unable to do so. (*Id.* ¶¶ 30, 44.) She went outside to yell for help, at which point Tomko and Price removed her from the house. Until that point, Ms. Hess had not known that police were on the scene. (*Id.* ¶ 45.) Neither Tomko nor Price checked on or administer first-aid to Fisher and they remained at the end of the driveway until an ambulance arrived approximately ten minutes after the shooting. (*Id.* ¶¶ 43-44.) Despite the efforts

3

of responding paramedics, Fisher died as a result of multiple gunshot wounds. (*Id.* ¶ 47.)[3]

### C. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed in whole or in part for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To decide a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). While "accept[ing] all of the complaint's well-pleaded facts as true," the court "may disregard any legal conclusions." *Id.* at 210-11. The court will generally consider only the complaint, exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

To overcome a Rule 12(b)(6) motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

---

[3] The Amended Complaint also contains two sections detailing the purported "factual histories" of both the City of Pittsburgh (ECF No. 43 ¶¶ 48-86) and Robinson Township (*Id.* ¶¶ 87-96). These will be addressed in later sections of the Court's analysis.

In assessing the sufficiency of a complaint, a court must therefore: (1) outline the elements the plaintiff must plead to state a claim for relief; (2) peel away any conclusory allegations that are not entitled to the assumption of truth; and (3) look for well-pled factual allegations, assume their veracity, and determine whether they plausibly give rise to an entitlement to relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 US at 679.

**D. Discussion**

    1. Constitutional claims against Officer Tomko

Count I asserts a claim under § 1983 for violations of the Fourth and Fourteenth Amendments.[4] Section 1983 does not itself create any rights; it merely serves as a vehicle for a plaintiff to vindicate rights that have already been secured elsewhere. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiff's claim at Count I can be broken down into three separate alleged constitutional violations: excessive force; failure to intervene; and failure to provide medical care.[5] Each

---

[4] Although Plaintiff asserts Count I against all Defendants, additional elements are required to support a § 1983 claim against a municipal defendant. The claims against the Pittsburgh and Robinson Defendants are therefore addressed in later sections of this analysis. As Price filed an Answer, the claim in Count I remains against him.

[5] The manner in which Count I is pleaded makes it more challenging to ascertain the specific roles and alleged liability of each of the defendants.

component, as related to Tomko, will be addressed in turn.

### a. Excessive force

Plaintiff alleges that Tomko's planning and execution of the door-knock was not objectively reasonable, thereby creating the circumstances that resulted in Fisher being shot. (ECF No. 56 ¶ at 5.) Tomko argues that he cannot be held liable for excessive force because there are no allegations that he himself used force or even physically touched Fisher. Thus, he argues that Plaintiff has failed to establish his personal involvement in the alleged misconduct. (ECF No. 48 at 5.)

A § 1983 plaintiff bears the burden of showing that each named defendant was personally involved in the alleged constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020); *Adams v. Springmeyer*, 2012 WL 1865736, at *9 (W.D. Pa. May 22, 2012) (quoting *Sykes v. Carroll*, 477 F. App'x 861 (3d Cir. 2012)) ("'[A] defendant in a civil rights action . . . cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'").

The Amended Complaint alleges that Tomko was initially tasked with finding Ms. Hess and that his investigation led to the Rydal house. The Rydal house is located within the jurisdiction of the Pittsburgh Police, and therefore, ultimately under its control. Accordingly, Tomko requested assistance in conducting a wellness check on Ms. Hess, resulting in both he and Price arriving at Fisher's house on September 1, 2022. As alleged in the Amended Complaint, the two officers decided that Tomko would proceed to the front door and Price would position himself in the front yard. (ECF No. 56 ¶ 26.) Tomko then initiated an aggressive door-knock while Price waited in the front yard.

Plaintiff does not allege that Tomko was in a supervisory role vis-à-vis Price or had actual knowledge about the possibility that Price might shoot Fisher, that he directed him to do so, or that he acquiesced in Price's actions. In fact, according to the Amended Complaint, when Fisher opened the door, it was Price who "decided to immediately shoot to kill" him, Price who "decided to use lethal force," and Price who exercised an "unwarranted utilization of deadly force." (ECF No. 56 ¶¶ 37, 39, 40.) Plaintiff does not allege that Tomko saw a firearm, felt he was in danger, instructed Price to shoot Fisher, or took any other action that represents the use of force. Simply put, Tomko did not shoot Fisher.

Thus, the Amended Complaint fails to point to conduct by Tomko sufficient to support a claim of excessive force. Even assuming that Tomko's actions in knocking on the door were not reasonable and led to Fisher opening the door armed with a firearm, Plaintiff alleges that it was Price who made the decision to shoot Fisher and then proceeded to do so. *See Jutrowski v. Twp. of Riverdale,* 904 F.3d 280, 289 (3d Cir. 2018) ("liability must be predicated on [defendant's] direct and personal involvement in the alleged violation"); *Witters v. Smith*, 736 F. Supp. 3d 238, 247 (M.D. Pa. June 10, 2024) (dismissing Fourth Amendment claim against parole agent who was present when fellow agent shot plaintiffs' dog based on lack of personal involvement).[6]

The excessive force claim against Tomko should therefore be dismissed. Typically, when dismissing a claim for failure to state a claim, "a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 236 (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)). "An amendment is futile if the amended

---

[6] Notably, Plaintiff cites no authority in his brief in opposition for the proposition that based on the facts of this case, Tomko could be liable for excessive force.

7

complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). Because the allegations clearly show that Tomko lacked sufficient personal involvement in the excessive force alleged to have been inflicted against Fisher, the dismissal should be with prejudice.

### b. Failure to intervene

Next, Plaintiff alleges that Tomko failed to take reasonable steps to protect Fisher from the use of lethal force. Plaintiff maintains that there was ample opportunity to intervene and "a significant window for de-escalation," throughout Tomko's planning and execution of the door-knock. (ECF No. 56 at 6.) Tomko argues that because Price shot Fisher within three seconds of him opening the front door, "no reasonable jury could conclude that Officer Tomko had a realistic opportunity to intervene." (ECF No. 48 at 6.)

To plead a failure to intervene claim, a plaintiff must allege: "(1) the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a 'realistic and reasonable opportunity to intervene.'" *Knight v. Walton*, 2014 WL 1316115, at *8 (W.D. Pa. Mar. 28, 2014) (quoting *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002)). "[T]he duration of the incident is key to determining whether there was a reasonable opportunity." *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020). But although failure to intervene is recognized as a distinct claim, it requires that there first be a finding of excessive force. *See Lora-Pena v. Denney*, 760 F. Supp. 2d 458, 468 (D. Del. 2011) ("[B]y definition, if there was no excessive force then there can be no failure to intervene.") (collecting cases). Plaintiff's ability to assert a failure to intervene claim is therefore tethered to the viability of the excessive force claim against Price.

A plaintiff claiming Fourth Amendment excessive force must show: (1) that a seizure occurred; and (2) that the seizure was unreasonable. *Est. of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003). The question under the Fourth Amendment is whether the officer's actions were "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts look at the totality of the circumstances, including: 1) "the severity of the crime"; 2) "whether the suspect poses an immediate threat to the safety of law enforcement officers or others"; and 3) "whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* Courts in this circuit must also consider "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). Because determining the reasonableness of force is such a fact-intensive endeavor, the Third Circuit has consistently held that it is a task generally best left to the jury. *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (citing *Abraham v. Raso*, 183 F.3d 279, 291 (3d Cir. 1999)).

It would therefore be premature for the Court to attempt to resolve whether the force used by Price against Fisher was reasonable this early in the proceedings. *See, e.g.*, *Bonilla v. City of York*, 2015 WL 1525483, at *6 (M.D. Pa. Apr. 2, 2015) (denying motion to dismiss because "jury presented with such facts may very well find that the use of deadly force in such a situation was indeed unreasonable"); *Ford v. City of Pittsburgh*, 2014 WL 7338758, at *4 (W.D. Pa. Dec. 22, 2014) ("[B]efore any discovery has been completed, it is surely premature to expect the Court to make such a resolution at the motion to dismiss stage"). Applying that same logic, it would be similarly inappropriate to attempt to extend the analysis one step further and determine whether there was a "realistic and reasonable opportunity" for Tomko to intervene in any excessive force

that may or may not have occurred. For now, it is enough that Plaintiff has alleged facts sufficient to plausibly state a claim for excessive force against Price, and in turn, Tomko's failure to intervene in that use of force.

### c. Failure to provide medical care

Finally, Plaintiff alleges that Tomko deprived Fisher of necessary medical care in violation of the Fourteenth Amendment by failing to render first-aid following the shooting. (ECF No. 56 at 6-7.) Tomko argues that Plaintiff's claim fails because an ambulance was called and arrived on scene ten minutes after the shooting. (ECF No. 48 at 6-7.)

The Fourteenth Amendment guarantees non-incarcerated individuals rights "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Cooleen v. Lamanna*, 248 F. App'x 357, 361 (3d Cir. 2007) ("[S]ubstantive due process rights are invoked by pre-trial detainees and other nonconvicted persons seeking medical care who cannot invoke the Eighth Amendment."). To state a claim for failure to provide medical care, a plaintiff must allege (1) that they have a serious medical need, and (2) acts or omissions by police officers indicating deliberate indifference to that need. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Peters v. Brown*, 793 F. App'x 118, 123 (3d Cir. 2019) ("We have found it constitutionally sufficient . . . to analyze pretrial detainees' claims of inadequate medical care under the familiar deliberate indifference standard.").

A medical need is "serious" if it is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). Plaintiff has undoubtedly alleged a serious medical need, as Fisher was

shot in the chest three times. Moreover, the facts set forth in the Amended Complaint show that Ms. Hess, a layperson, recognized the seriousness of Fisher's injuries and was the first person who "attempted to stop his bleeding[.]" (ECF No. 43 ¶ 44.)

"Deliberate indifference is a 'subjective standard of liability consistent with recklessness as that term is defined in criminal law.'" *Natale*, 318 F.3d at 582 (quoting *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000)). "Deliberate indifference exists where there is 'objective evidence that [a] plaintiff had serious need for medical care' and the need was ignored or delayed for non-medical reasons." *Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014) (quoting *Natale*, 318 F.3d at 582)).

Tomko argues that Plaintiff's claim fails because the facts alleged show that Fisher was shot, officers called an ambulance, paramedics arrived ten minutes later, and medical aid was rendered. According to Tomko, he had "no special medical training beyond basic first aid in treating gunshot wounds." (ECF No. 48 at 7.) "Other than calling for EMS and remaining on scene, it is unclear what else Officer Tomko, who was in shock from the incident could have done." (*Id.* at 8.)

But viewing the allegations in the light most favorable to Plaintiff, the Amended Complaint alleges that Tomko immediately retreated from the door after Fisher was shot. He then remained at the end of the driveway for the ten minutes it took for the ambulance to arrive. During that time, he did not know or even attempt to find out if Fisher was still alive. Without the benefit of discovery, it is simply too early to definitively say whether Tomko's actions in delaying treatment "diminished [Fisher's] chances of survival."[7] *Smith*, 553 F. App'x at 177. For now, though, it is

---

[7] Tomko further contends: "Even if Plaintiff alleges a plausible constitutional duty to provide

sufficient that Plaintiff alleged that Tomko made "a decision to let [Fisher] bleed to death in his own home" (ECF No. 43 ¶ 46), thereby plausibly pleading deliberate indifference to Fisher's serious medical needs.

Finally, Tomko also argues that he is entitled to qualified immunity because it would not be clear to a similarly situated officer in the same circumstances that merely calling an ambulance, without more, was unlawful. (ECF No. 48 at 8-9.) As the Third Circuit has cautioned, "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (per curiam); *see also Ford*, 2014 WL 7338758, at *4 (citing *Debrew v. Auman*, 354 F. App'x 639, 642 (3d Cir. 2009)) ("[U]nless a complaint discloses that a police officer did not violate clearly established law when firing at a suspect, dismissal on qualified immunity grounds is premature."). The circumstances alleged place this case among the "vast majority of cases" in which dismissal on qualified immunity grounds would be inappropriate at the pleading stage.

---

medical care in this case, where Plaintiff was shot after brandishing a firearm, the Amended Complaint fails to demonstrate that the Officers' actions 'shock the conscience,' as required by the Third Circuit precedent in cases involving state created danger claims and/or allegations of failure to provide medical care." (ECF No. 48 at 7.) This is simply not the case, as courts in our district have recognized that officers on the scene do, in fact, have an affirmative duty to provide medical care to individuals they have shot. *See, e.g.*, *Williams v. City of Scranton*, 2013 U.S. Dist. LEXIS 46459, at *20-21 (M.D. Pa. Apr. 1, 2013) ("It is also beyond dispute that the SPD officers on the scene had an affirmative duty to provide medical care to [plaintiff]."); *Hogan v. City of Easton,* 2004 U.S. Dist. LEXIS 16189, 2004 WL 1836992, at *11 (E.D. Pa. Aug. 15, 2004) (finding officers had affirmative duty to provide medical care to citizen they had shot). Whether Fisher was brandishing a firearm is irrelevant to the analysis at hand, which merely asks whether Plaintiff has plausibly stated a claim under the Fourteenth Amendment. Moreover, Plaintiff is not required to allege that Tomko's conduct "shocks the conscience," as she is free to proceed under a theory of deliberate indifference.

2. *Monell* claims

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original). Thus, Plaintiff's § 1983 claims under the Fourth and Fourteenth Amendments at Count I, which allege that the City of Pittsburgh and Robinson Township are vicariously liable for Tomko and Price's actions, are not viable under *Monell*. It is therefore recommended that such claims be dismissed with prejudice.

Instead, a city or county government, such as the City of Pittsburgh or Robinson Township, are deemed a "person" under § 1983 and may only be found liable for their own misconduct. *Id.* at 692. To state a plausible claim under *Monell*, a plaintiff must allege that their injury was caused by: (1) "an unconstitutional policy or custom"; or (2) failure-to-train, supervise, or discipline "amount[ing] to deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). Plaintiff has also asserted failure-to-train claims against the City of Pittsburgh (Count II) and Robinson Township (Count III).

a. City of Pittsburgh

Plaintiff alleges that the City of Pittsburgh failed to train its police officers in various ways, including:

a. Failing to teach officers how to properly to give verbal warnings prior to using deadly force;

b. Failing to teach officers how to properly give commands prior to using deadly force;

c. Failing to teach officers how to properly announce themselves as police and to use less lethal options prior to restoring [sic] to the use of deadly force.

d. Failure to properly screen, supervise, discipline, transfer, counsel or otherwise

13

      control police officers, including the officers who killed Brian Fisher who are known or should have been known to engage in improper use of excessive force and deadly force;

e. Creating and implementing procedures that allow for and promote the use of deadly force in unwarranted and under unjustified circumstances;

f. Training the officers to use deadly force seconds after encountering an individual rather than less confrontational and less harmful methods such as physical restraint or other detention techniques.

g. Otherwise violating the rights of the Decedent.

(ECF No. 43 ¶ 120(a)-(g).) Plaintiff also points to a Consent Decree between Pittsburgh and the U.S. Department of Justice, prior lawsuits, and public records involving settlements paid by the City of Pittsburgh to purportedly show a pattern of excessive use of force and misconduct within the PBP. These added facts purportedly demonstrate that the City of Pittsburgh was on notice that its training policies were "woefully inadequate, allowing a culture of excessive force and disregard for constitutional rights to continue."[8] (ECF No. 57 at 4-5.)

      The Pittsburgh Defendants argue that Plaintiff failed to show a causal connection between any alleged training deficiencies and Fisher's injuries, as required to sustain liability under *Monell*. They also contend that the Consent Decree and prior lawsuits lack factual similarity and temporal proximity to the events of this lawsuit. (ECF No. 50 at 6-17.)

---

[8] Plaintiff also alleges that the "policies, customs, practices, and procedures of the City of Pittsburgh which allow the use of deadly force without any expectation of danger are unconstitutional per se." (ECF No. 43 ¶ 118.) Pittsburgh Defendants argue that the specific use of force policies Plaintiff references are facially constitutional and therefore cannot support liability. *See* ECF No. 50-1, 50-2. The Court agrees, as the subject policies permit PBP officers to use only "reasonable" force and expressly forbid officers from using "any force that is excessive." *Id. See King v. City of Phila.*, 66 F. App'x 300, 305 (3d Cir. 2003) ("Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.") (quoting *Monell*, 436 U.S. at 694).

A claim brought under a "failure-to-train" theory requires that the plaintiff "demonstrate that a city's failure to train its employees 'reflects a deliberate or conscious choice.'" *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)). For a claim against police officers, the Supreme Court has held that the failure to train "serve[s] as [a] basis for § 1983 liability only where [it] . . . amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). At the motion to dismiss stage, deliberate indifference is pled by showing that: "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (quoting *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011)). "[C]onclusory and general claims of failure to screen, train, or supervise employees to avoid constitutional violations" are insufficient. *Wood v. Williams*, 568 F. App'x 100, 104 (3d Cir. June 4, 2014).

In addition, the plaintiff must also bear the "burden of proving that the municipal practice was the proximate cause of the injuries suffered." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). To satisfy this requirement, a plaintiff "must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Id.* Causation is typically an issue for the jury. *Panas v. City of Phila.*, 871 F. Supp. 2d 370, 378 (E.D. Pa. May 14, 2012); *Ford*, 2014 WL 7338758, at *7. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz*, 915 F.2d at 851.

At this early stage, it is the Court's view that Plaintiff has stated a plausible *Monell* claim against the City of Pittsburgh. The Consent Decree was indeed ended in 2002, and standing alone, likely would not be enough to support Plaintiff's position that the City of Pittsburgh was on notice of police misconduct like that alleged to have caused Fisher's death. When viewed together with the other lawsuits cited by Plaintiff and the allegations of other complaints and settlements involving PBP officers' use of force, however, "we may fairly infer that the problems that led to it were occurring during the time of his allegations and for some time before that." *Est. of Roman*, 914 F.3d at 799.

        *b. Robinson Township*

Unlike the claim against the City of Pittsburgh, Plaintiff does not allege that Robinson Township has a history of similar police misconduct, prior lawsuits, or settlements. Instead, Plaintiff merely pleads that "Robinson Township's secretive use of force policies have inadequately trained its police officers, including Officer Tomko, in both when its proper to use force and in how to deescalate encounters with the public." (ECF No. 43 ¶ 94.)

Plaintiff nonetheless alleges that Robinson Township failed to adequately train its officers by:

    a. Failing to teach officers how to properly announce themselves when knocking on a door;

    b. Failing to teach officers how to properly to give verbal warnings prior to using deadly force;

    c. Failing to teach officers how to properly give commands prior to using deadly force;

    d. Failing to teach officers how to properly announce themselves as police and to use less lethal options prior to restoring to the use of deadly force;

  e. Faling [sic] to teach officers how to properly announce themselves when they are knocking on a door;

  f. Failure to properly screen, supervise, discipline, transfer, counsel or otherwise control police officers, including the officers who killed Brian Fisher who are known or should have been known to engage in improper use of excessive force and deadly force;

  g. Creating and implementing procedures that allow for and promote the use of deadly force in unwarranted and under unjustified circumstances;

  h. Training the officers to use deadly force seconds after encountering an individual rather than less confrontational and less harmful methods such as physical restraint or other detention techniques.

  i. Failing to ensure officers understand the importance of announcing themselves when knocking on a door;

  j. Otherwise violating the rights of the Decedent.

(*Id.* ¶ 148(a)-(j).) Many of the other allegations in Count III involve specific actions taken by Tomko, *see, e.g.*, *Id.* ¶¶ 152-56, 165, followed by conclusory remarks regarding Robinson Township's alleged failure to train stemming from "an intentional, reckless, and callous disregard to the constitutional rights and the life of [Fisher]." (*Id.* ¶ 172.) Without more, these generic allegations are not enough to state a claim against Robinson Township. *Wood*, 568 F. App'x at 104.

  It is therefore recommended that the Robinson Defendants' motion to dismiss be granted as to Count III and that the *Monell* claim against Robinson Township be dismissed. Because the Court cannot conclude at this time that Plaintiff could never assert a plausible *Monell* claim against Robinson Township, it is recommended that the dismissal be without prejudice.

### III. CONCLUSION

For these reasons, it is respectfully recommended that Defendants' motions to dismiss (ECF Nos. 47, 49) be granted to the extent that:

1. The excessive force claim against Tomko at Count I is dismissed with prejudice.

2. The Fourth and Fourteenth Amendment claims against the City of Pittsburgh and Robinson Township at Count I are dismissed with prejudice.

3. The *Monell* claim against Robinson Township at Count III is dismissed without prejudice and with leave to amend.

It is further respectfully recommended that Defendants' motions be denied in all other respects.

### IV. NOTICE

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties may, within (14) days, file objections to this Report and Recommendation. Failure to do so will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).


Dated: May 8, 2025                /s/ Patricia L. Dodge
                                  PATRICIA L. DODGE
                                  UNITED STATES MAGISTRATE JUDGE